UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

CARL J. DRUCKER, II,                )
                                    )
                    Plaintiff,      )
                                    )
          v.                        )          No. 2:20-cv-00334-JPH-MKK
                                    )
BOBBI RIGGS, et al.                 )
                                    )
                    Defendants.     )

**Order Granting Defendants' Motion for Summary Judgment,
Denying Plaintiff's Motions to Supplement the Record,
and Directing Entry of Final Judgment**

Plaintiff Carl Drucker, an Indiana Department of Correction (IDOC) inmate at Wabash Valley Correctional Facility ("Wabash Valley"), alleges in this civil rights action that defendants violated his Eighth Amendment rights when they were deliberately indifferent to his serious medical needs and his conditions of confinement. Dkt. 10 at 5. The defendants seek summary judgment on Mr. Drucker's claims.

For the reasons explained in Part I and II of this Order, the defendants' motion for summary judgment, dkt. [38], is **GRANTED.** For the reasons explained in Part III of this Order, Mr. Drucker's pending motions to add exhibits and newly discovered evidence to supplement the summary judgment record, dkts. [61], [65], [67], and [70], are **DENIED**.[1]

---

[1] As discussed in Part III, the additional evidence referenced in these filings is not considered in the Court's resolution of the summary judgment motion.

## I. Defendants' Motion for Summary Judgment

### A. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the Court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### B. Material Facts

The following statement of facts is recited pursuant to the standard above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the evidence is presented in the light reasonably favorable to Mr. Drucker as the non-moving party. *See Stark v. Johnson & Johnson*, 10 F.4th 823, 825 (7th Cir. 2021).

### C. The Parties

2

Dr. Byrd and Dr. Rajoli were physicians employed by Wexford of Indiana, LLC ("Wexford") at Wabash Valley during the relevant time. Dkt. 40-2, ¶¶ 1-2; dkt. 40-1, ¶¶ 1-2.

Barbara Riggs was a registered nurse employed by Wexford at Wabash Valley. Dkt. 40-3, ¶¶ 1-2. In her role as a nurse, Ms. Riggs does "not have the legal authority to diagnose a patient or order specific medical treatment." *Id.*, ¶ 12.

Kim Hobson was a nurse employed by Wexford as its Health Services Administrator ("HSA") at Wabash Valley. Dkt. 40-4, ¶¶ 1-2. HSA Hobson's role is "primarily administrative in nature," and she is usually not involved in direct patient care or contact. *Id.*, ¶ 6. Rather, she "serves as a liaison between IDOC and medical staff, and also responds to requests for information and grievances on behalf of the medical department." *Id.* HSA Hobson attests that she bases her responses to offenders' grievances on discussions she has with providers and a review of medical records. *Id.*, ¶ 7. She does "not have the legal authority to diagnose a patient or order specific medical treatment. " *Id.*, ¶ 5.

Mr. Drucker is an IDOC inmate incarcerated at Wabash Valley. Prior to incarceration, Mr. Drucker injured his left leg in a motorcycle accident. Dkt. 40-6 at 4. Mr. Drucker required extensive surgery, and he lost a "massive amount of bone," which caused his left leg to be "an inch and half short[er]" than his right leg. *Id.* Also before he was incarcerated in 2009, Mr. Drucker had been shot in the knee and fell twenty-five feet from a window which caused additional injuries

to his legs and knees, and these injuries required two orthoscopic surgeries to his left knee. Dkt. 2 at 3-4.

The record includes Mr. Drucker's lengthy medical history at Wabash Valley, spanning from 2010 to present. Mr. Drucker filed his complaint in this action on July 1, 2020. Dkt. 2. Thus, the Court will address the most relevant medical history that pertains to his claims, including his specific interactions with each defendant.

### D. Mr. Drucker's Medical Treatment at Wabash Valley

#### 1. Before March 2019

Between 2017 and 2019, Mr. Drucker had several interactions with IDOC medical staff, none of whom are defendants in this case. As a result of those visits, Mr. Drucker was prescribed a range of orthopedic devices and received knee injections to help with pain. *See, e.g.,* dkt. 40-2, ¶ 9; dkt. 40-5 at 103-04, 110; dkt. 40-6 at 7, 10, 13; dkt. 48 at 5, 7, 101. Also, Mr. Drucker was permitted to wear specially ordered 8-inch boots ("support boots") for several years. Dkt. 40-5 at 107–08; dkt. 48 at 7. But since 2018, his requests for new support boots have not been approved. Dkt. 48 at 5.

#### 2. March to December 2019

 Mr. Drucker's condition started to worsen in 2019, dkt. 40-6 at 7, so the interactions he had with the defendants from then forward are the most relevant to his claims.

Dr. Rajoli saw Mr. Drucker in the chronic care clinic on March 6, 2019, for several conditions including osteoarthritis. Dr. Rajoli advised him to take

Tylenol in moderation and to continue his activities of daily living but to avoid strenuous sports. Dkt. 40-5 at 96-100.

On June 11, 2019, Nurse Riggs saw Mr. Drucker about his insoles. Dkt. 40-3, ¶ 5; dkt. 40-5 at 94-95. Mr. Drucker reported that his support boots were 9 months old and that they would likely last 6 months more, but that he needed new insoles. Dkt. 40-5 at 94. Nurse Riggs noted the insoles were "worn through at the toes and heel" and forwarded a request to HSA Hobson to order replacements. Dkt. 40-3, ¶ 5; dkt. 40-5 at 95. Mr. Drucker received the new insoles and tried them on for proper fit on July 3, 2019. Dkt. 40-5 at 93.

Mr. Drucker received a left knee injection for pain on August 9, 2019, and then saw Dr. Rajoli a few weeks later at a chronic care visit. *Id.* at 86-92. Dr. Rajoli noted Mr. Drucker's history of degenerative joint disease in his knees and advised him to continue low-impact exercises to help lose weight. *Id.* Dr. Rajoli increased Mr. Drucker's dosage of Keppra to assist with his pain, discontinued Tylenol, and advised him to try supplementing with over-the-counter Ibuprofen for pain and to avoid strenuous sports. Dkt. 40-1, ¶ 5.

Mr. Drucker received another knee injection on December 20, 2019. Dkt. 40-5 at 83-85.

### 3.  January to July 2020

Nurse Riggs saw Mr. Drucker on January 16, 2020. *Id.* Her medical notes indicate that she and HSA Hobson met with Mr. Drucker and explained that his request for new support boots was not approved by the Regional Medical Director

("RMD") and that instead, he was approved for diabetic shoes[2] and ankle braces. *Id.*

Mr. Drucker requested an orthopedic consult by an outside provider and an MRI at the end of January 2020. *Id.* at 77-82. He saw Dr. Byrd, who noted this visit "focused on a recent denial of orthopedic boots," and Mr. Drucker's frustration with the denial. *Id.* Dr. Byrd "tried to reassure him that we simply need to give new recommendations from RMD a trial vs. assuming the worst." *Id.* These alternative recommendations were use of diabetic shoes with ankle braces. Dkt. 40-2, ¶ 5. Dr. Byrd explained that an MRI would only confirm his diagnosis—that he had "significant degenerative change from his knees to his feet given his prior injuries." *Id.* He advised that providers were "trying to help him manage pain the best we can onsite with leaving no options off the table when referral seems appropriate." Dkt. 40-5 at 77.

Mr. Drucker requested another knee injection, and Dr. Byrd agreed to have one scheduled. *Id.* To address Mr. Drucker's complaints of burning pain in his foot and toes, Dr. Byrd increased his Keppra dose to 750 mg in response to Mr. Drucker's feedback that Keppra provided some relief. *Id.* at 77, 80.

---

[2] Mr. Drucker disputes that he ever received any diabetic shoes but does not dispute that he received two ankle braces. Dkt. 40-6 at 14-15. But Mr. Drucker has designated no evidence that the defendants deliberately delayed or ignored an order for diabetic shoes. Therefore, even in the light most favorable to Mr. Drucker, the Court does not find that his failure to receive diabetic shoes, viewed in the context of the totality of his care, establishes that any defendant was deliberately indifferent. Deliberate indifference requires "more than negligence and approaches intentional wrongdoing." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (internal citation omitted).

On February 18, 2020, Nurse Riggs saw Mr. Drucker in response to multiple requests for healthcare forms about his "declining health problems" in his knees, ankles, and feet. *Id.* at 75-76. Mr. Drucker requested to be sent to a specialist and complained of pain. *Id.* Nurse Riggs explained that Mr. Drucker's x-rays showed that he suffers from arthritis, "an aging process" which could result from his past injuries. *Id.* Mr. Drucker complained that Nurse Riggs was denying him medical treatment, with the medical notes indicating that he wanted Tylenol for pain. *Id.* Nurse Riggs talked to the provider but "did not receive any new orders." *Id.* The medical chart notes that Mr. Drucker became argumentative and was asked to leave. *Id.* He also requested an injection for his toe, but Nurse Riggs explained to him that the provider "states that this is not something that is done." *Id.* Mr. Drucker continued to have an active prescription for an increased dose of Keppra at this time. *Id.*

On March 3, 2020, Mr. Drucker received two ankle braces with plastic inserts and tried them on to ensure proper fit. *Id.* at 74. A week later, he received a knee injection. *Id.* at 73.

Dr. Byrd saw Mr. Drucker on March 26, 2020, for pain in his toe and left knee. *Id.* at 68-72. Mr. Drucker had moderate-to-severe arthritis in his toe, and he believed his pain was due to his support boots being denied by the RMD. *Id.* at 68. Dr. Byrd advised him that due to COVID-19, medication management was the only option, and started a trial of nortriptyline to address the pain. *Id.* Mr. Drucker complained of a sensation of grinding and popping in his knee that caused it to feel like it was going to give out and that his knee injection did not

improve the pain. *Id.* Dr. Byrd advised him that he "has definite arthritic/degenerative changes" that no doubt cause "some level of pain." *Id.*

At this visit, Dr. Byrd reviewed Mr. Drucker's medical chart "in great detail for 1 hour" and because Mr. Drucker was not pleased with prior intervention of ankle braces, Dr. Byrd ordered open patella knee sleeves and prescribed Pamelor, in addition to the active prescription for increased Keppra, to address Mr. Drucker's complaints. *Id.* at 71; dkt. 40-2, ¶ 6. Dr. Byrd noted that heel lifts and insoles had already been ordered. Dkt. 40-2, ¶ 6. Mr. Drucker received a knee injection the next day. Dkt. 40-5 at 67.

Nurse Riggs saw Mr. Drucker on April 3, 2020, for his knee, ankle, and foot pain, but she explained that there was nothing further that could be done at this time because Dr. Byrd had prescribed Pamelor and had administered knee injections in late March. Dkt. 40-3, ¶ 8. A prescription for Keppra was still active. Dkt. 40-5 at 65-66. Nurse Riggs' medical notes indicated that she tried to issue insoles and lifts on this visit, but Mr. Drucker wanted to wait. *Id.* On April 6, 2020, Mr. Drucker received insoles and medium heel lifts and tried them on for proper fit. *Id.* at 64.

Dr. Rajoli saw Mr. Drucker a week later and noted that he was able to perform his activities of daily living. Dkt. 40-1, ¶ 6. He prescribed Tylenol for pain and advised Mr. Drucker to refrain from strenuous sports. *Id.* Mr. Drucker had active prescriptions for both Keppra and Pamelor. Dkt. 40-5 at 59-62. Dr. Rajoli documented that Mr. Drucker was able to use the stairs, complete

community errands, complete cooking activities, dress himself, and walk household and community distances. *Id.*

Nurse Riggs saw Mr. Drucker on April 27, 2020, for his knee, ankle, and toe pain. Dkt. 40-3, ¶ 9. She explained that Pamelor could be increased for better pain relief and Mr. Drucker agreed to try an increased dose. *Id.* In response, Nurse Riggs contacted the provider and orders were received to increase Pamelor to 50 mg. *Id.*; dkt. 40-5 at 57-58.

A month later, Dr. Rajoli saw Mr. Drucker for his chronic condition and pain. Dkt. 40-5 at 53-56. He noted that pain was relieved by a brace and rest and that Mr. Drucker could complete his daily activities. *Id.* Mr. Drucker had already been provided with a knee sleeve, and because he stated it was not helping his stability, Dr. Rajoli provided him with an ace wrap "to improve the stability of the joint." *Id.* Mr. Drucker was advised to wear it at "all times when ambulating." *Id.* Mr. Drucker testified that he also fell in May 2020 due to his issues with his leg and knee, the fall caused him to break his left hand, and that he was referred to an orthopedist but only for his hand. Dkt. 40-6 at 16-17.

Mr. Drucker received a knee injection on June 12, 2020. Dkt. 40-5 at 52. Mr. Drucker saw Nurse Riggs for his toe pain on June 17, 2020, and he requested that his toe be fixed because COVID-19 restrictions had been lifted. *Id.* at 49-51. Nurse Riggs noted that Mr. Drucker walked to the infirmary without difficulty, could get on and off the exam table, and was walking without a cane. *Id.* She explained that COVID-19 restrictions had not been lifted and that his x-ray showed that he had arthritis in the toe. *Id.* She noted that Mr. Drucker was

9

located on the southside, and that Dr. Rajoli, the southside doctor, stated there was no treatment for an arthritic toe other than what Mr. Drucker was already receiving. *Id.* Nurse Riggs spoke to the provider and relayed to Mr. Drucker that he was to use his ace wrap, knee sleeve, and cane.[3] *Id.*

Nurse Riggs saw Mr. Drucker again on June 22, 2020, and he requested a new cane. Dkt. 40-3, ¶ 11; dkt. 40-5 at 47. Nurse Riggs told him that there was no adjustable cane available at that time, but he would be contacted once one was available. *Id.* Mr. Drucker received an adjustable cane on July 5, 2020. Dkt. 40-5 at 43-45. He maintains that he had to take action to follow up with someone other than Nurse Riggs to get his cane. Dkt. 40-6 at 18.

### 4. Medical Treatment After Complaint Filed

The Court summarizes relevant medical treatment after Mr. Drucker filed this action on July 1, 2020.

Dr. Rajoli saw Mr. Drucker on July 8, 2020, and he noted that Mr. Drucker was non-compliant with his various devices, including his cane, ankle braces, and knee sleeves. Dkt. 40-1, ¶ 8. Mr. Drucker maintains that he was compliant with wearing his knee sleeve and braces, but he would not always wear the ace bandage underneath because he believed it cut off his circulation. Dkt. 40-6 at 18-19. Dr. Rajoli reviewed Mr. Drucker's current pain medications and found them to be appropriate, advised Mr. Drucker of the "realistic expectation with regards to his pain medications and their effectiveness in addressing chronic

---

[3] It is not clear when Mr. Drucker was first assessed for a cane or was issued one.

pain," and advised supplementation of medication and home exercises. Dkt. 40-5 at 38-42. When Mr. Drucker asked about re-ordering support boots, Dr. Rajoli reviewed this with HSA Hobson and "it was identified that inmate patient is provided with ankle braces to be used with DOC shoes.[4]" *Id.* He had active prescriptions for Keppra and Tylenol. *Id.*

Dr. Byrd saw Mr. Drucker on July 30, 2020 for his knee issues. *Id.* at 33-37. Mr. Drucker was not taking Pamelor because it made him "angry." *Id.* He complained that his leg was now giving out, causing him to frequently fall down. *Id.* Mr. Drucker sought an orthopedic referral, but Dr. Byrd advised him that his condition was degenerative and that it was best to continue home exercises such as knee extensions to strengthen his quadricep muscles as he had been previously encouraged to try. *Id.* Dr. Byrd observed that Mr. Drucker's knee-cap "sits loose in the femoral grove," and expected that the knee "could give out if [the] knee cap jumped out of the femoral groove either medially or laterally." *Id.* Increasing quadriceps' strength "with time would likely stabilize the joint" but would not completely alleviate pain due to arthritis. *Id.* Dr. Byrd did not believe that Mr. Drucker was compliant with his home exercises. *Id.* He offered to give him TheraBands to use in the infirmary to conduct further strengthening exercises, but Mr. Drucker was not interested in coming to the infirmary, and these bands are not allowed in an inmate's cell. *Id.* Dr. Byrd titrated Keppra to

---

[4] Mr. Drucker explained that IDOC provides either five-inch or five-and-a-half-inch boots but the boots he preferred and was previously receiving were 8.5 inches and provided him better support. Dkt. 40-6 at 11-12.

1000 mg as Mr. Drucker requested, and because this "is a mainstay in treatment" for his condition. *Id.*

Dr. Rajoli saw Mr. Drucker on August 26, 2020, and he noted that Mr. Drucker ambulated with his cane and had two pain medications that had been recently titrated. *Id.* at 26-30. Mr. Drucker stated he was not getting enough clinical care, and Dr. Rajoli reviewed the interventions thus far and believed Mr. Drucker to be non-compliant with home exercises. *Id.* He advised Mr. Drucker to continue with the prescribed treatment plan and recommended physical therapy "to provide gait training and proper use of the cane." *Id.*

Mr. Drucker attended physical therapy for approximately four sessions during September 2020, and his potential for rehabilitation was designated as "good." *Id.* at 5-9, 11-25. The physical therapist noted that Mr. Drucker had worn-out left shoe inserts and walked incorrectly with his cane on the wrong side. *Id.* at 21-23. Mr. Drucker was educated on how to apply his ace bandage to stabilize his knee, received gait training on proper use of his cane, and was given exercises. *Id.* Mr. Drucker was advised on how to proceed with a request for a specially raised shoe, as the therapist noted such shoe and orthotics could even out his leg discrepancy and the therapist would discuss this with the provider depending on facility policy in acquisition of orthotics from outside sources. *Id.* at 17, 21-23.

On Mr. Drucker's last physical therapy visit, the therapist noted that he admitted his psychological problems were interfering with his recovery, and the therapist noted that he had full range of motion and walked fairly steadily but

with a limp, that he had good muscle strength, but that it is "not certain what makes him fall but his behavior may contribute as a manipulation technic." *Id.* at 5. The therapist noted it would be reasonable to assist him with a shoe wedge. *Id.* at 6.

Dr. Rajoli saw Mr. Drucker on November 17, 2020, for a renewal of orthotic inserts. *Id.* at 1-4. Dr. Rajoli requested the new orthotic insert and was awaiting approval from the RMD. *Id.* Mr. Drucker had active prescriptions for Keppra and acetaminophen at this time. *Id.* Mr. Drucker's request was approved by the RMD on November 19, 2020, and he was to receive shoe inserts for his length discrepancy. *Id.* at 112 (RMD "[a]gree[d] with shoe insert for leg length discrepancy" and approved formulary exception request).

At his April 2021 deposition, Mr. Drucker's treatment plan continued to include doses of Tylenol and Keppra, twice per day, and he continued to use his adjustable cane. Dkt. 40-6 at 3, 18.

## II. Discussion

### A. Eighth Amendment Medical Claims

To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter*, 836 F.3d 722, 728 (7th

Cir. 2016); *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett* 658 F.3d at 750-51.

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). This is a "subjective standard" that "requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

Prisoners do not have a constitutional right to demand specific medications, medical evaluation, treatment, or medical devices. *Arnett*, 658 F.3d at 754 ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible . . . ." Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm."). "A medical professional is entitled to a deference in treatment decisions unless no minimally competent professional would have [recommended the same] under the circumstances." *Pyles*, 771 F.3d at 409. "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

For the purposes of their motion for summary judgment, the defendants do not dispute that Mr. Drucker's conditions were objectively serious medical needs, so the only issue is whether they were deliberately indifferent to those conditions.

**B. Eighth Amendment Conditions-of-Confinement Claims**

The Eighth Amendment's proscription against cruel and unusual punishment protects prisoners from the "unnecessary and wanton infliction of pain" by the state. *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (citation and internal quotations omitted). Pursuant to the Eighth Amendment, prison officials have the duty to provide humane conditions of confinement: "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer,* 511 U.S. at 832 (internal quotation omitted).

To succeed on a conditions-of-confinement claim under the Eighth Amendment, a plaintiff must demonstrate that 1) he was incarcerated under conditions that posed a substantial risk of objectively serious harm, and 2) the defendants were deliberately indifferent to that risk, meaning they were aware of it but ignored it or failed "to take reasonable measures to abate it." *Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014); *Pyles*, 771 F.3d at 409; *Townsend v. Fuchs,* 522 F.3d 765, 773 (7th Cir. 2008) (citing cases).

The objective showing requires "that the conditions are sufficiently serious—*i.e.,* that they deny the inmate the minimal civilized measure of life's necessities, creating an excessive risk to the inmate's health and safety." *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019) (internal quotation omitted). "According to the Supreme Court, … 'extreme deprivations are required to make out a conditions-of-confinement claim.'" *Id.* (quoting *Hudson*, 503 U.S. at 9). "If under contemporary standards the conditions cannot be said to be cruel and

unusual, then they are not unconstitutional, and [t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* (internal quotation omitted).

After showing the objective component, a plaintiff must next establish "a subjective showing of a defendant's culpable state of mind," and "the state of mind necessary to establish liability is deliberate indifference to the inmate's health or safety." *Id.* (internal quotation omitted). Negligence or even gross negligence is not sufficient to support deliberate indifference. *See Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018).

### C. Defendant Nurses

#### 1. HSA Hobson

Mr. Drucker alleges that HSA Hobson lied in her grievance responses and failed to assist him in getting proper treatment from providers. Dkt. 2 at 5. He argues that HSA Hobson was aware of his circumstances because she had meetings with Nurse Riggs or his other providers, and claims that her responses to his grievances about providers were inadequate. Dkt. 48 at 25.

A constitutional violation based on deliberate indifference "may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or turns a blind eye to it." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (cleaned up). An inmate's correspondence to a prison official may provide sufficient knowledge of a constitutional deprivation. *Id.* at 781-82. "[O]nce an official is alerted to an excessive risk to inmate safety or health

16

through [an inmate's] correspondence, refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Id.* at 782. But if, upon learning of an inmate's complaints, a prison official reasonably responds to those complaints, the prison official lacks a "sufficiently culpable state of mind" to be deliberately indifferent. *See Johnson v. Doughty*, 433 F.3d 1001, 1010-11 (7th Cir. 2006) (finding grievance counselor did not violate the Eighth Amendment where he researched inmate's complaint, learned that medical professionals had seen and diagnosed an inmate with medical condition and determined that surgery was not required); *Burks v. Remisch*, 555 F.3d 592, 594-95 (7th Cir. 2009) (affirming grant of summary judgment to prison complaint examiner who denied grievance as untimely "because she carried out her job exactly as she was supposed to"); *see also Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002) ("Even if he recognizes the substantial risk [to an inmate's health or safety], an official is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" (quoting *Farmer*, 511 U.S. at 843).

HSA Hobson attested that she did not lie in her grievance responses and bases any responses upon discussions with the offender's providers and a review of medical records. It is undisputed that Ms. Hobson did not have legal authority to order any specific treatment, including ordering any orthotics or ambulatory devices, nor did she have authority to diagnose Mr. Drucker's condition. Mr. Drucker has designated no evidence that HSA Hobson did not conduct appropriate investigations or did not reasonably rely upon the information she

17

was given during those investigations of his grievances to formulate her responses to them. Further, Mr. Drucker has not provided evidence that HSA Hobson blocked his receipt of proper health care.

No reasonable fact-finder could conclude that HSA Hobson was deliberately indifferent to Mr. Drucker's medical condition or conditions of confinement. Accordingly, she is entitled to summary judgment.

### 2. Nurse Riggs

Mr. Drucker argues that Nurse Riggs blocked him from seeing providers and prevented him from receiving adequate medical care. He argues that she was responsible for discontinuing his approval for support boots because she told him that he should not qualify for them anymore. Dkt. 48 at 16-17. Mr. Drucker contends that Nurse Riggs yelled at him and belittled him during meetings. *Id.*

"Nurses, like physicians, may [ ] be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 486 (7th Cir. 2022).

The record shows that Nurse Riggs took multiple actions to assist Mr. Drucker over the course of his treatment. For example, Nurse Riggs examined his insoles and forwarded a request for replacement to the HSA when she determined they were worn out. When Mr. Drucker asked about receiving new support boots, she informed him that the order was not approved by the RMD and that other recommendations were put in place. Mr. Drucker has designated no evidence showing that Nurse Riggs was responsible for any termination of his

18

previously permitted support boots. It is undisputed that Nurse Riggs did not have the authority to direct Mr. Drucker's treatment, and the record indicates that the termination decision was made by the RMD.

On subsequent visits, Nurse Riggs addressed Mr. Drucker's pain complaints by contacting the provider about Mr. Drucker's request for Tylenol. She attempted to put in his request for lifts and insoles, but Mr. Drucker elected to wait through the weekend. When Mr. Drucker continued to complain of pain, Nurse Riggs told him that his Pamelor prescription could be adjusted up and contacted the provider for an order to do so. Nurse Riggs later explained there were no new orders for different treatment, a joint replacement, or to address Mr. Drucker's arthritis in his toe. Finally, when Mr. Drucker sought an adjustable cane, Nurse Riggs informed him he would be contacted when there was one in stock that could be issued to him. The fact that Mr. Drucker disagrees with the quality of Nurse Riggs' treatment is insufficient to establish deliberate indifference. *Pyles*, 771 F.3d at 409; *Reck*, 27 F.4th at 486.

No reasonable fact-finder could conclude that Nurse Riggs was deliberately indifferent to Mr. Drucker's medical condition or conditions of confinement. Accordingly, she is entitled to summary judgment.

### D. Defendant Doctors

Mr. Drucker contends that the doctors pursued an ineffective course of treatment for his worsening condition, that he was denied support boots, and that he was not provided adequate treatment or devices. Dkt. 47. Specifically, he argues that he was given cheap and defective heel lifts that did not match his leg

discrepancy. *Id.* He also believed he needed further diagnostic testing such as an MRI and an outside consult from an orthopedic specialist. *Id.*

A doctor's treatment decisions are entitled to a great deal of deference. *See Petties*, 835 F.3d at 729; *Pyles*, 771 F.3d at 409. "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409 (where prisoner wanted different treatment because his medications were not helping, his disagreement with the physician did not allow him to prevail on his Eighth Amendment claim where the physician's choice of treatment was not blatantly inappropriate).

Dr. Byrd and Dr. Rajoli regularly saw Mr. Drucker for his chronic condition which they believed was degenerative in that "a certain level of pain is unavoidable." Dkt. 40-1, ¶ 11; dkt. 40-2, ¶ 8. Both doctors attested that it was their professional medical opinion that Mr. Drucker was not in need of any different medical treatment, other than what was provided. The doctors argue that they provided Mr. Drucker with appropriate care and treatment and assistive devices for his condition. Dkt. 39 at 13.

### 1. Dr. Byrd[5]

---

[5] Mr. Drucker argues that he was ridiculed by the defendants, and in particular, that Dr. Byrd mocked him by referring to him as "Mother Drucker." Dkt. 47 at 2. The Court acknowledges that the record contains an email from Dr. Byrd to another staff member referring to Mr. Drucker in this manner. *See* dkt. 48-1 at 144. While unprofessional, these comments do not establish an Eighth Amendment violation. *See DeWalt v. Carter*,

During the course of his treatment, Dr. Byrd: increased Mr. Drucker's dose of Keppra to address his pain; provided him with open patella knee sleeves and a prescription of Pamelor to continue to address his stability issues and pain; recommended home exercises in an effort to increase Mr. Drucker's leg muscles to provide for better ambulation and to combat his knee popping out of place; recommended that Mr. Drucker use TheraBands in the infirmary to work on developing his leg strength; and continued to administer regular knee injections to help manage Mr. Drucker's chronic condition.

### 2. Dr. Rajoli

During his course of his treatment, Dr. Rajoli: increased Mr. Drucker's Keppra dosage; recommended Ibuprofen to supplement for pain, and issued Tylenol; provided Mr. Drucker with an ace wrap to use in conjunction with his knee sleeve to provide more support for his knee; recommended physical therapy on site to further address his condition and to provide education on proper use of his cane and ambulatory techniques; and put in a request for Mr. Drucker to receive a renewal of orthotics for his leg discrepancy, which was later approved by the RMD.

### 3. Shoes and ambulatory devices

Mr. Drucker also argues that neither doctor adequately responded to his request for support boots or other assistive devices. However, he has not shown

---

224 F.3d 607, 612 (7th Cir. 2000), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020); *Beal v. Foster*, 803 F.3d 356, 357–58 (7th Cir. 2015) (recognizing that "most verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment.").

that his previously issued support boots were medically required, or even more directly relevant to his claims against Dr. Byrd and Dr. Rajoli, that either doctor was responsible for terminating his ability to receive them. With respect to the diabetic shoes, its undisputed that it was recommended that he receive them. While Mr. Drucker claims that he did not receive the shoes, he has not designated evidence showing that either doctor knew that he did not receive them. Nor has he shown that he needed, but failed to receive, any further diagnostic testing or particular ambulatory device.

While Mr. Drucker disagrees with the course of his treatment, Dr. Byrd and Dr. Rajoli are entitled to deference in their decisions "unless no minimally competent professional would have so responded under those circumstances" because "there is no single proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (internal quotation marks and citations omitted). Mr. Drucker fails to establish that no minimally competent professional would have responded like Dr. Byrd or Dr. Rajoli. Moreover, he has not shown that any of their treatment was ineffective because the doctors failed to eliminate his pain completely. *See, e.g., Leiser v. Hoffmann, et al.*, 2021 WL 3028147, at *3 (7th Cir. July 19, 2021) ("[D]octors are not deliberately indifferent when they are unable to eliminate completely a patient's pain.") (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

No reasonable fact-finder could conclude that Dr. Byrd or Dr. Rajoli were deliberately indifferent to Mr. Drucker's medical needs or conditions of confinement. Accordingly, the doctors are entitled to summary judgment.

### III. Mr. Drucker's Motions to Supplement the Record

The Court now turns to four motions Mr. Drucker filed after the defendants' motion for summary judgment was completely briefed. These motions seek to supplement the summary judgment record by adding exhibits and newly discovered evidence. For the reasons explained herein, these motions are **denied**.

### A. Motion to Add Additional Exhibits

First, the defendants filed their motion for summary judgment on July 27, 2021. Dkt. 38. Mr. Drucker's response in opposition was timely filed. Dkt. 53. Thereafter, the defendants filed their reply, and Mr. Drucker filed a surreply. Dkt. 50; dkt. 51. The Court granted Mr. Drucker's motion to correct his response in opposition. Dkt. 53 at 2. Mr. Drucker then proceeded to file three motions to add additional exhibits to his response. Dkt 55; dkt. 56; dkt. 58. The Court granted those motions to the extent that the exhibits would be considered by the Court in evaluating the defendants' motion for summary judgment. Dkt. 60.

Nearly five months later, Mr. Drucker filed yet another motion to add more exhibits. Dkt. 61. In that motion, Mr. Drucker states that on August 14, 2021, he was wrongly placed on suicide watch and his property was packed up and inventoried before his release from suicide watch three days later. *Id.* As a result, eight exhibits pertaining to this case were "mixed into his criminal legal

paperwork, making them lost to him[.]" *Id.* at 1. He states he did not discover the issue until April 26, 2022. *Id.*

The defendants argue that briefing on summary judgment has closed, that Mr. Drucker had not shown good cause for adding more exhibits, and that they would be prejudiced if the Court granted Mr. Drucker's motion. Dkt. 62. The Court previously allowed Mr. Drucker to supplement the record on multiple occasions, and he has not shown good cause that would justify allowing him to supplement the record again.  Therefore, his motion to add exhibits, dkt. [61], is **denied**.

### B. Motions to Add Newly Discovered Evidence

Beginning nearly a year after summary judgment briefing closed and to date, Mr. Drucker has filed three motions to add newly discovered evidence. Dkt. 65; dkt. 67; dkt. 70. These motions concern an MRI that Mr. Drucker received of his left knee in October 2022, and a later outside surgical consult, both of which occurred over two years after he filed his complaint in this action. Dkt. 65 at 2.

The defendants argue that Mr. Drucker should not be allowed to indefinitely supplement the summary judgment record as he has repeatedly attempted to do, that he has not provided the alleged MRI results,[6] and that even

---

[6] Mr. Drucker states that he has made numerous requests with the facility to attain copies of his medical records showing the MRI results and surgical consult, but that these efforts have been unsuccessful. Dkt. 70 at 2. He contends that the defendants are "in possession of these documents and are the ones prohibiting, blocking, delaying, and retaliating against the Plaintiff, and are refusing to produce them to the Plaintiff." *Id.* In response, defendants' counsel states no request for production has been received from

if he had provided the MRI results, that alone would not establish that the defendants were deliberately indifferent in this case. Dkt. 68 at 1-2.

All of Mr. Drucker's motions are verified and signed under penalty of perjury. Therefore, Mr. Drucker has designated his additional testimony related to the results of his 2022 MRI testing and surgical consult, but he has not designated as evidence the actual medical records reflecting this further treatment. However, taken in the light most favorable to Mr. Drucker, even if he had designated the relevant medical records along with his testimony, the Court's analysis is unchanged.

Mr. Drucker states the MRI "confirmed that his left meniscus was torn, his ACL was partial[l]y torn, and his joint was damaged," and he was put on a medical lay-in and given a request for an urgent ortho-referral. Dkt. 65 at 2. He states the MRI "has vindicated Plaintiff's claims that have been ignored for years," and that the test should have been performed prior to the filing of the defendants' motion for summary judgment. *Id.* He argues that this test "proves an injury requiring medical attention. Not degenerative changes of old age, as the defendants have repeatedly told the Plaintiff and this Court." *Id.* Mr. Drucker states the MRI "confirms that these injuries are several years old[.]" Dkt. 67 at 1.

In November 2022, Mr. Drucker was told at an outside medical consult that his injuries required surgery, and that he likely also has a torn meniscus

---

Mr. Drucker related to these documents. Dkt. 71 at 2. Moreover, discovery closed in this matter at the end of June 2021. Dkt. 20.

and torn ACL in his right knee but needs another MRI to confirm this diagnosis. *Id.* at 3. Mr. Drucker had surgery on his left knee in January 2023, and he states that his right knee will be addressed after he heals from this recent procedure. Dkt. 70 at 2.

These developments took place more than two years after Mr. Drucker filed his complaint in this action and well after briefing of the defendants' motion for summary judgment closed. It is possible that the records reflect a change in Mr. Drucker's circumstances that was not present during the time of the events alleged in this case. *See e.g.,* dkt. 67-1 at 9 (Dec. 12, 2022 health care request form stating: "when I last fell, I really hurt my right knee. I tore something in it, most likely my ACL and meniscus, thats what the specialist said at my Union Hospital consult. . . ").

It is also possible, as Mr. Drucker argues, that his MRI testing and surgical consult indicate that he was misdiagnosed or improperly treated by the defendants. *See e.g.,* dkt. 67 at 2. But even if this were the case, a misdiagnosis without more, does not establish an Eighth Amendment deliberate indifference claim. *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017). And even if it were negligence, negligence—even gross negligence—does not meet the deliberate indifference standard. Deliberate indifference "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *Huber*, 909 F.3d at 208 (internal quotation omitted). "Medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim."

*Graham v. Zatecky*, No. 1:19-cv-00851-JRS-TAB, 2020 WL 6129586, at *7 (S.D. Ind. Sept. 29, 2020 (even if defendant's treatment of plaintiff's hand "could be seen to be negligent or even grossly negligent no reasonable trier of fact could find that the treatment or lack thereof constitute a wanton infliction of pain") (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997)).

Mr. Drucker has not demonstrated that the defendants' treatment plans were blatantly inappropriate. Rather, the record reflects that Mr. Drucker's condition was not ignored, but that he received a continued system of care from prior to his filing of this action, after the filing of his complaint, and to date. Given the totality of this care, no jury could reasonably infer that the defendants were deliberately indifferent to Mr. Drucker's medical conditions. *See, e.g., Tracy v. Wexford of Ind., LLC*, No. 1:20-cv-00496-JPH-TAB, 2022 WL 4599138, at *8 (S.D. Ind. Sept. 30, 2022) (defendants were not deliberately indifferent to plaintiff's nerve pain when alternative methods of various medications, a back support, physical therapy, and home exercises were prescribed) (citing *Petties*, 836 F.3d at 728 (courts consider totality of a prisoner's care in considering claims for deliberate indifference). Therefore, Mr. Drucker's motions to add newly discovered evidence, dkts. [65], [67], and [70] are **denied**.

### IV. Conclusion

For the reasons explained in Parts I and II of this Order, the defendants' motion for summary judgment, dkt. [38], is **GRANTED**.

For the reasons explained in Part III of this Order, Mr. Drucker's motions to add additional exhibits and newly discovered evidence, to supplement the summary judgment record, dkts. [61], [65], [67], and [70] are **DENIED**.

Final Judgment consistent with this Order and the Court's screening entry of October 30, 2020 (docket 10), shall now issue.

**SO ORDERED.**

Date: 2/14/2023

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

CARL J. DRUCKER, II
980552
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel